**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

SHEILA S. PHILLIPS,           )      CASE NO.  5:10-cv-2651
                                    )
        Plaintiff,          )
                                    )      MAGISTRATE JUDGE
        v.               )      VECCHIARELLI
                                    )
MICHAEL J. ASTRUE,          )
      Commissioner of Social Security,    )
                                    )      **MEMORANDUM OPINION AND**
        Defendant.        )      **ORDER**

Plaintiff, Sheila S. Phillips ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On July 25, 2007, Plaintiff filed application for a POD and DIB, and on July 26, 2007, Plaintiff filed an application for SSI.  (Tr. 13.)  In both applications, Plaintiff alleged a disability onset date of June 25, 2003.  (Tr. 13.)  Both applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 13.)  On January 21, 2010, an ALJ held Plaintiff's hearing by video conference.  (Tr. 13.)  Plaintiff appeared, was represented by an attorney, and testified.  (Tr. 13.)  A vocational expert ("VE") also appeared and testified. (Tr. 13.)  On March 8, 2010, the ALJ found Plaintiff not disabled.[1]  (Tr. 27.)  On October 10, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On November 20, 2011, Plaintiff timely filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)

On March 17, 2011, Plaintiff filed her Brief on the Merits.  (Doc. No. 13.)  On May 18, 2011, the Commissioner filed his Brief on the Merits.  (Doc. No. 15.)  On May 19, 2011, Plaintiff filed a Reply Brief.  (Doc. No. 16.)

Plaintiff asserts two assignments of error:  (1) the ALJ improperly rejected Plaintiff's treating physician's opinion; and (2) the Commissioner failed to meet his burden to show that Plaintiff could perform a significant number of jobs in the national economy.

---

[1] The ALJ noted that Plaintiff received a prior decision by an Administrative Law Judge on March 6, 2006 (Tr. 13), but the ALJ does discuss the prior decision further in her decision.

2

## II.   EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 38 years old on her alleged disability onset date (Tr. 25) and 44

years old on the date of her hearing before the ALJ (Tr. 33).  She has a limited

education and is able to communicate in English.  (Tr. 25.)  She has past relevant work

experience as a receptionist, housekeeper, production assembler, and small products

assembler.  (Tr. 25.)

### B.    Medical Evidence

On June 7, 2002, Plaintiff presented to Robinson Memorial Hospital's

Emergency Room with a chief complaint of neck pain and stiffness.  (Tr. 241.)  Dr. Paul

Jesionek, M.D., attended to Plaintiff and indicated that Plaintiff reported the following.

(Tr. 241.)  Plaintiff had suffered almost constant discomfort and pain in her neck and

the right occipital scalp region for the past several weeks.  (Tr. 241.)  The symptoms

waxed and waned in severity, but there was no paresthesia or weakness.  (Tr. 241.)

Plaintiff did not have any history of prior back problems and no other joint or extremity

pain.  (Tr. 241.)  An x-ray of Plaintiff cervical spine revealed no acute bony

abnormalities but only some degenerative changes and loss of lordotic curve.  (Tr. 241.)

Plaintiff was diagnosed with "persistent musculoskeletal neck pain," was given Motrin

and Valium at the Emergency Room, was discharged with a prescription for Skelaxin,

and was advised to take Ibuprofen as well.  (Tr. 241-42.)

On December 4, 2002, Plaintiff presented to the Emergency Room with a chief

complaint of neck pain and stiffness.  (Tr. 239.)  Dr. Michael Pryce, M.D., initially

3

attended to Plaintiff and indicated that Plaintiff reported the following.  (Tr. 239.)

Plaintiff had ongoing neck pain with stiffness and spasms, as well as occipital

headaches, for the past six months.  (Tr. 239.)  She underwent chiropractic treatment to

no avail.  (Tr. 239.)  She had no history of injury or trauma, paresthesias, or weakness

in her extremities.  (Tr. 239.)

Dr. Alexander Jakubowycz, M.D., examined Plaintiff and reported that, when he

entered the room where Plaintiff waited, Plaintiff was sitting and speaking with her

boyfriend and, when he approached Plaintiff to introduce himself, Plaintiff "put[] her

head into a left lateral position and [held] it there."  (Tr. 239.)  Dr. Jakubowycz further

reported that, as he spoke with Plaintiff, Plaintiff was able to "mov[e] her neck quite

freely" and "[did] not seem to be having any limitation at all."  (Tr. 239.)  Dr. Jakubowycz

diagnosed Plaintiff with torticollis[2] and recommended prescription therapy.  (Tr. 240.)

On May 18, 2004, Plaintiff presented to the Emergency Room with a chief

complaint of "head discomfort" and a lump on her scalp.  (Tr. 235.)  Dr. Dennis Haver,

M.D., attended to Plaintiff and noted upon physical examination that Plaintiff

"chronically holds her head turned to the side but she seems to be able to  move it fairly

well."  (Tr. 235.)  Dr. Haver further noted that Plaintiff "can put her chin down to her

chest."  (Tr. 235.)  Dr. Haver diagnosed Plaintiff with "acute head discomfort," a scalp

lesion, and hypertension and recommended that Plaintiff undergo prescription therapy.

(Tr. 236.)  Dr. Haver reported that Plaintiff did not desire further testing and intended to

---

[2] Torticollis is "a contracted state of the cervical muscles, producing twisting of
the neck and an unnatural position of the head."  Dorland's Illustrated Medical
Dictionary 1924 (30th ed. 2003).

4

follow up with her treating physician.  (Tr. 236.)  Plaintiff was released in stable condition.  (Tr. 236.)

On March 23, 2005, Plaintiff began presenting to Dr. Lawrence M. Saltis, M.D., for treatment of her neck.  (Tr. 246.)  Dr. Saltis noted that Plaintiff suffered idiopathic[3] torsion dystonia[4] of the neck, hypertension, hyperlipidemia, an anxiety disorder, depression, and thyroid disease with hypothyroidism.  (Tr. 246.)  Dr. Saltis further noted that Plaintiff had torticollis for approximately three years, and that "Dr. McPherson" gave Plaintiff two "Botox shots" that did not provide Plaintiff relief.  (Tr. 285.)

On June 8, 2005, Plaintiff underwent an MRI of her cervical spine.  (Tr. 307.)  Dr. Virginia C. Porter, M.D., interpreted the results and concluded that, although there were small posterior disc bulges at C4-5, 5-6, and 6-7 with straightening of the normal cervical lordotic curve, there was no evidence of central canal stenosis or significant neural foraminal narrowing.  (Tr. 307.)

On June 16, 2005, Plaintiff underwent Botox injection treatment for her neck. (Tr. 280.)  On June 30, 2005, Dr. Saltis reported that Plaintiff's torsion dystonia of the neck was "markedly improved" after the recent Botox injection.  (Tr. 277.)  Dr. Saltis continued, however, that Plaintiff still had limited range of motion with extension, flexion, and lateral movement.  (Tr. 277.)

On July 1, 2005, Plaintiff presented to Dr. Roger Weiss, D.O., for a nerve

---

[3]  Idiopathic means of unknown cause or spontaneous origin.  Dorland's Illustrated Medical Dictionary, *supra* note 2, at 905.

[4]  Dystonia is "[s]ustained abnormal posture[] and disruption[] of ongoing movement resulting from alterations in muscle tone."  The Merck Manual 1465 (17th ed. 1999).  One type of dystonic syndrome is torticollis.  *Id.* at 1466.

conduction study.  (Tr. 308.)  Dr. Weiss indicated that Plaintiff reported tingling and pain in her left arm and hand and "some neck pain" that Botox injections had recently improved.  (Tr. 308.)  Dr. Weiss reported that the nerve conduction study was normal, and that although Plaintiff had a cervical dystonia, neck pain, and headaches, Plaintiff was clinically improving.  (Tr. 308.)

On August 30, 2005, Dr. Saltis indicated that Plaintiff reported her neck spasms and headaches were returning, and that her neck became worse throughout the day. (Tr. 274.)  On October 13, 2005, Dr. Saltis indicated that Plaintiff rated her neck pain at 8 out of 10 in severity.  (Tr. 271.)  On October 24, 2011, Plaintiff underwent further Botox injection treatment.  (Tr. 270.)  On December 29, 2005, Dr. Saltis indicated that Plaintiff reported the second Botox injection treatment provided little benefit.  (Tr. 267.) Still, Dr. Saltis treated Plaintiff with Botox injections throughout the next year.  (Tr. 262-63, 254.)

On August 3, 2006, Dr. Saltis indicated that Plaintiff reported the Botox injections reduced her pain from a rating of 10 out of 10 in severity to 5 out of 10 in severity, although her head still tilted to the left.  (Tr. 255.)  On February 1, 2007, Dr. Saltis indicated that Plaintiff reported the Botox treatments were "a significant help."  (Tr. 250.) On June 13, 2007, Dr. Saltis reported that Plaintiff had no new problems and that Plaintiff's response to the last Botox injection was "good."  (Tr. 249.)

On November 14, 2007, state agency consultative physician Dr. Eli Perencevich, D.O., performed a physical RFC assessment of Plaintiff and determined the following. (Tr. 342-49.)  Plaintiff could lift and carry 10 pounds occasionally and less than 10 pounds frequently.  (Tr. 343.)  She could sit, stand, and walk for about 6 hours in an 8-

hour workday with normal breaks.  (Tr. 343.)  Her abilities to push and pull were not limited except to the extent that she was limited in her abilities to lift and carry.  (Tr. 343.)  She could occasionally climb ramps and stairs, stoop, kneel, and crouch; and she could never climb ladders, ropes, and scaffolds, balance, or crawl.  (Tr. 344.)  She was limited in her ability to reach in all directions, as she could not reach overhead with both arms.  (Tr. 345.)  She had no visual or communicative limitations.  (Tr. 345-46.)  She should avoid concentrated exposure to hazards such as moving machinery and heights.  (Tr. 346.)  Dr. Perencevich noted that his physical RFC assessment was adopted from a prior ALJ's determination dated January 20, 2006, because Plaintiff's medical records did not show a significant change in Plaintiff's condition.  (Tr. 343.)  Dr. Perencevich also noted that Plaintiff's "symptoms outweigh what would be expected given the medical evidence."  (Tr. 347.)

On May 12, 2008, Plaintiff's primary care physician, Dr. Okap Kwon, M.D., performed a physical RFC assessment of Plaintiff and indicated the following.  (Tr. 361-62.)  Plaintiff's cervical dystonia limited Plaintiff's ability to lift such that she could lift no more than 10 pounds.  (Tr. 361.)  She could walk for only 1 hour total in an 8-hour workday because she had trouble breathing.  (Tr. 361.)  She could sit for only 1 hour total in an 8-hour day, and for one-half of an hour at a time without interruption, because she had muscle spasms and back aches that her Botox injection treatments did not alleviate.  (Tr. 361.)  She could never climb, balance, stoop, crouch, kneel, or crawl because she could not maintain her balance.  (Tr. 362.)  But she was not limited in her abilities to reach, handle, feel, push, pull, see, hear, and speak.  (Tr. 362.)  Her ability to tolerate work environments with heights, and vibrations was not affected, but

her ability to tolerate work environments with moving machinery, temperature extremes, chemicals, dust, noise, fumes, and humidity was affected.  (Tr. 362.)

From 2008 through 2009, Plaintiff presented to Dr. Steven A. Gunzler, M.D., at the Botulinum Toxin Clinic for treatment of her cervical torticollis and neck pain.  (Tr. 363-70, 386-87, 430-33.)  On April 29, 2008, Dr. Gunzler indicated that Plaintiff reported that her past Botox injection took three weeks to take effect but helped the posture of her head and improved her headache pain; however, tenderness in her left neck and shoulder persisted, her headaches did not resolve, and the treatment wore off one month prior.  (Tr. 363.)  Dr. Gunzler noted that Plaintiff "ha[d] not tried any specific headache prophylaxis, such as nortriptyline or topiramate," but "[i]nstead . . . chronically treated these headaches with various pain medications insluding NSAIDs, Tylenol, and Vocodin."  (Tr. 363.)  On physical examination of Plaintiff's neck, Dr. Gunzler reported that "there remains a rightward shift, leftward tilt of approximately 20-30 degrees, and left shoulder clevation."  (Tr. 363.)  Dr. Gunzler continued that "[t]here is a minimal and questionable leftward turn."  (Tr. 363.)  Dr. Gunzler's impression was that Plaintiff's headaches were "a tension-type versus migranious headache that seems related to the dystonia."  (Tr. 364.)  Dr. Gunzler further noted that Plaintiff was interested in continuing to obtain Botox injection treatment for her headaches and that she would consider headache prophylaxis if the Botox injections did not improve her condition.  (Tr. 364.)

On September 9, 2008, Dr. Gunzler indicated that Plaintiff reported the following. (Tr. 365-66.)  Plaintiff's last Botox injection took two weeks to take effect and then provided relief from her symptoms for approximately 3 and one-half months—Plaintiff's neck had straightened and her neck pain was almost eliminated.  (Tr. 365.)  Her

8

symptoms were now intermittent; her neck pain was on the left side of her neck and along the trapezious.  (Tr. 365.)  Tylenol eliminated her headaches.  (Tr. 365.)  Upon physical examination, Dr. Gunzler reported that Plaintiff's left shoulder was elevated, and Plaintiff's head was tilted leftward with a possible leftward turn and rightward shift of her neck.  (Tr. 366.)  Dr. Gunzler noted that Plaintiff's gait was unaffected.  (Tr. 366.)  Dr. Gunzler recommended that, because the Botox injection helped Plaintiff for at least 3 months, Plaintiff should undergo further Botox injections every 3 rather than 4 months.  (Tr. 366.)

On January 5, 2009, Dr. Gunzler indicated that Plaintiff reported the following.  (Tr. 367-68.)  Plaintiff's headaches continued and became more severe, and the Tylenol and NSAIDs she had been taking were becoming less effective.  (Tr. 367.)  Her last Botox injection provided her relief for 2 months.  (Tr. 367.)  Dr. Gunzler provided Plaintiff with another Botox injection and also began Plaintiff on Topamax for her headaches.  (Tr. 368.)

On April 6, 2009, Dr. Gunzler indicated that Plaintiff continued to report only mild relief from her treatments.  (Tr. 388.)  On August 3, 2009, and November 16, 2009, Dr. Gunzler indicated that Plaintiff reported she was "pleased" with the effect of her last series of Botox injections because they helped her pain and posture; however, Plaintiff desired a higher dose of Botox for greater relief.  (Tr. 386, 430.)  Dr. Gunzler noted that Plaintiff's "neck pain is inadequately controlled with botulinum toxin and steroid injections, in combination with Vicodin," but recommended that Plaintiff continue such treatments.  (Tr. 433.)

On July 29, 2009, Plaintiff began presenting to the Western Reserve Spine and

Pain Institute for treatment of her neck pain.  (Tr. 425.)  Through December 2009,

Plaintiff reported her neck pain within a range of 3 to 4 out of 10 in severity to 8 out of

10 in severity.  (Tr. 390, 409, 419, 425.)  An MRI on August 20, 2009, revealed "grossly

normal" anatomic alignment, signal intensity, and vertebral and disc heights.  (Tr. 423.)

Plaintiff was prescribed Vicodin (Tr. 409, 421); and the various physicians and nursing

staff who attended to Plaintiff reported that Plaintiff's "[q]uality of life has improved as a

result of taking pain medications," and that "[t]here are no adverse side effects from the

medications."  (Tr. 390, 409.)

### C. Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff testified at her hearing as follows.  Plaintiff stopped working full-time

sometime between 2006 and 2008.  (Tr. 35.)  She believed she could not work because

she suffered neck pain and shortness of breath.  (Tr. 42-43.)  She suffered pain in the

back and left side of her neck that traveled down her left arm and caused pain in her

elbow and tingling in her hand and fingers.  (Tr. 37.)  She also suffered headaches that

she believed were caused by her neck problems.  (Tr. 40.)

Plaintiff suffered her pain every day—mainly in the morning when she woke up

and got out of bed, but also periodically throughout the day.  (Tr. 37.)  She received

Botox injections every three months that would allow her to "hold her head straight," but

their effect lasted for only two months.  (Tr. 43.)  She received epidural steroid

injections in her neck, but they did not help her.  (Tr. 36.)  She also took Vicodin for her

neck pain and "Toporimate" for her headaches, but the Vicodin made her feel tired.  (Tr.

35, 40.)  Her medications kept her pain under control "most of the time."  (Tr. 42.)  She could "sometimes" turn her head to look from side to side, and she could look up and down.  (Tr. 38.)

Plaintiff began having trouble breathing one and a half years prior, although she quit smoking only two months prior to her hearing.  (Tr. 38.)  She became short of breathe when she walked across her mobile home.  (Tr. 39.)  She took Flovent twice a day to help with her breathing.  (Tr. 38.)

Plaintiff had a drivers license and drove "a couple times a week" to go to the grocery store.  (Tr. 33-34.)  She sometimes went to the grocery store with her fiancé, but when she went alone she was able to load and unload bags of groceries from her car.  (Tr. 34.)  She also walked to the grocery store, but she could walk for only 15 minutes before her legs became tired.  (Tr. 41.)  She is unable to hold her arms up for a long time because they become tired.  (Tr. 37.)  She is right-hand dominant but can lift things with her left hand if they are not too heavy.  (Tr. 37.)  It was difficult for her to lift a gallon of milk, but she could lift a cup of coffee.  (Tr. 34, 44.)  She could "probably" type on a computer keyboard, but she was not sure because she did not type.  (Tr. 44.)  She did not know whether she could use a knife and fork with her left hand because she never tried.  (Tr. 37.)  She dropped things from her hand on occasion because she was "very clumsy."  (Tr. 45.)  She was able to wash dishes, do her laundry, and vacuum.  (Tr. 39, 43.)  She watched television six to eight hours a day while sitting with her legs elevated.  (Tr. 39.)

Plaintiff believed her condition had become worse since January of 2006.  (Tr. 46.)

11

### 2.    The VE's Testimony

Plaintiff's counsel stipulated to the VE's qualifications.  (Tr. 46.)  The ALJ

proposed the following hypothetical person to the VE:

> If we were to assume a younger individual with a limited education.  And I'm
> going to take first several RFCs.  The first one coming from the prior ALJ
> decision.  Physical functional capacity to lift up to ten pounds and carry up
> to ten pounds, sit, stand and walk for six hours, with no balancing, kneeling,
> crawling, or climbing, occasionally stooping and crouching, less than
> occasional or no overhead work with the left non-dominant extremity, and no
> concentrated exposure to hazardous machinery, fumes, gas and chemicals,
> no unprotected heights at the unskilled level, with occasional contact with the
> public, co-workers, supervisors.

(Tr. 48.)  The VE testified as follows.  Such a person could not perform Plaintiff's past

relevant work.  (Tr. 49.)  Although the ten-pound lifting and carrying limitation would

usually limit individuals to sedentary work, such individuals could also perform a

reduced range of light work.  (Tr. 48.)  Therefore, such a person could perform the

following light, unskilled work:  photocopying machine operator (for which there were

17,000 jobs in the national economy); office helper (for which there were 60,000 jobs in

the national economy); and mail clerk (for which there were 29,000 jobs in the national

economy).  (Tr. 48-49.)

The VE cited the Dictionary of Occupational Titles during his testimony.  (Tr. 48-

49.)  The VE stated that the jobs were only examples, that there were other jobs that

such a person could perform, and that the numbers of jobs were based on a reduction

of larger numbers to accommodate the ten-pound lifting and carrying limitation.  (Tr. 48-

49.)

The ALJ then posed a second hypothetical:  "If we were to take a second

hypothetical at the sedentary range with the same postural limitations, also unskilled,

12

also with occasional contact with supervisors, co-workers, public, would there be jobs such a person could do?" (Tr. 50.) The VE responded that such a person could perform the following sedentary, unskilled work: addresser (for which there were 25,000 jobs in the national economy); document preparer (for which there were 50,000 jobs in the national economy); and weight tester (for which there were 12,000 jobs in the national economy). (Tr. 50.)

The ALJ then asked whether such a person could perform any other work if she had to take one-hour naps every day, or if the person were absent more than two days a month. (Tr. 50.) The VE responded that such a person would not be able to perform any other work. (Tr. 50.)

Plaintiff's attorney then posed the following hypothetical person to the VE based on a physical RFC assessment by Plaintiff's treating physician:

> The first one limits ten pounds, can stand and walk one hour a day, could sit no more than one hour at a top [sic], well actually it would be 30 minutes at a time, but no more, it says here, than one hour during a day. There would be no climbing, balancing, stooping, crouching, kneeling, or crawling. And there would also be limitations regarding no moving machinery and temperature extremes, chemicals, dusts, noise, fumes, or humidity.

(Tr. 51.) The VE testified that such a person could not perform other work because she would not be able to sustain an eight-hour workday. (Tr. 51.)

Plaintiff's attorney then asked whether a person who was tardy to work three or four times a month because of morning headaches could perform other work. (Tr. 52.) The VE testified that such a person would not be able to perform other work. (Tr. 52.)

Plaintiff's attorney did not challenge the adequacy of the jobs to which the VE testified.

### III.   STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and*

14

416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.    The claimant has not engaged in substantial gainful activity since June 25, 2003, the alleged onset date.

3.    The claimant has the following severe impairments: cervical dystonia, headaches and depression.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work . . . except the claimant can lift and carry up to ten pounds.  She can lift overhead less than occasionally with her non-dominant upper extremity. The claimant cannot perform balancing, kneeling, climbing or crawling activities.  She can occasionally stoop and crouch.  In addition the claimant cannot work in environments with concentrated exposure to fumes, gases, chemicals or hazardous machinery.  The claimant can perform unskilled work which requires no more than occasional public contact. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting under SSR 85-15.

15

6.     The claimant is unable to perform any past relevant work.

. . . . .

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.    The claimant has not been under a disability, as defined in the Social Security Act, from June 25, 2003 through the date of this decision.

(Tr. 13-26.)

## V.     LAW & ANALYSIS

### A.     Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ.  *Id.*  However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that

16

the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.    The ALJ's Assessment of Plaintiff's Treating Physician**

Plaintiff contends that the ALJ improperly rejected the opinion of Plaintiff's treating physician, Dr. Okap Kwon.  For the following reasons, the Court disagrees.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  But If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (1996)).

17

Here, the ALJ stated "I give Dr. Kwon's assessment little weight because there is no objective evidence to support the inability to stand or walk for more than one hour a day." (Tr. 23.)  The ALJ further explained the following.  Plaintiff's "physical evaluations have repeatedly shown that her gait and station is normal and there has never been an indication that the claimant has limitations with sitting, standing or walking." (Tr. 23.)  And, although Plaintiff testified and other evidence showed that Plaintiff "had difficulty" with her left side, Dr. Kwon did not specify Plaintiff's lifting ability with her left extremity as compared to her right, dominant extremity. (Tr. 23.)  In other words, the ALJ gave Dr. Kwon's opinion little weight because it was unsupported by objective medical evidence and was inconsistent with the evidence as a whole.  These were permissible bases to reject Dr. Kwon's opinion. *See Bogle*, 998 F.2d at 347-48; *Wilson*, 378 F.3d at 544.

Plaintiff contends that the ALJ "played doctor" by selectively reviewing the evidence, and that the ALJ's assessment of Dr. Kwon's credibility is not supported by substantial evidence, because:  (1) Dr. Kwon's opinion of Plaintiff's abilities to lift and carry is consistent with state agency reviewing physician Dr. Perencevich's opinion that Plaintiff could lift and carry only ten pounds; (2) Dr. Kwon's opinion was entitled to more weight, as Dr. Kwon's assessment of Plaintiff was presumably based on his long-term relationship and personal experience with Plaintiff; and (3) although there were no limitations on Plaintiff's legs or back, the pain in Plaintiff's neck and the side-effects from Plaintiff's pain medication *could have* caused the sitting, standing, and walking limitations included in Dr. Kwon's opinion.  For the following reasons, the Court disagrees with Plaintiff's contentions.

18

"The ALJ, not a physician, is assigned the responsibility of determining a claimant's RFC based on the evidence as a whole." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (Nugent, J.) (citing 20 C.F.R. § 416.946(c)).  Here, the ALJ based her assessment of Dr. Kwon's opinion and Plaintiff's RFC on the record evidence; accordingly, there is no basis to conclude that she "played doctor."  *Cf. Nelms v. Gardner*, 386 F.2d 971, 973 (6th Cir. 1967) (finding that the ALJ improperly determined that the plaintiff's pain was not as severe as the plaintiff alleged based on personal observations and facts regarding the plaintiff's physical condition without citation to any evidence).

The consistency of Dr. Kwon's opinion with Dr. Perencevich's that Plaintiff could lift and carry ten pounds does not support the conclusion that Dr. Kwon's opinion of Plaintiff's abilities to sit, stand, and walk was credible.  Although the Court agrees that, generally, a treating physician is in a better position to give an opinion of a claimant's symptoms and limitations than a reviewing, non-examining physician, a treating physician's opinion may be given less weight when it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence—which are precisely the reasons why the ALJ gave Dr. Kwon's opinion less weight.

Furthermore, Plaintiff's argument that her pain and the side effects from her pain medication *could have* caused the sitting, standing, and walking limitations included in Dr. Kwon's opinion is speculative and unavailing.  The ALJ's credibility assessment of Dr. Kwon's opinion is supported by substantial evidence and a decision supported by substantial evidence will not be overturned even though substantial evidence also

19

supports the opposite conclusion.  *See Ealy*, 594 F.3d at 512.  In short, the Court is not

persuaded that the ALJ "played doctor," selectively reviewed the evidence, and failed to

give good reasons for rejecting Dr. Kwon's opinion.

### C.    The Commissioner's Burden to Show Plaintiff Could Perform Other Work

At the fifth and final step of an ALJ's analysis, the ALJ must determine whether,

in light of the claimant's residual functional capacity, age, education, and past work

experience, the claimant can make an adjustment to other work.  20 C.F.R. §

404.1520(a)(4).  At this step, the burden shifts to the Commissioner to prove the

existence of a significant number of jobs in the national economy that a person with the

claimant's limitations could perform.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391

(6th Cir. 1999).  If the Commissioner satisfies this burden, the claimant will be found not

disabled.  C.F.R. § 404.1520(g)(1).  To meet this burden, there must be a finding

supported by substantial evidence that the claimant has the vocational qualifications to

perform specific jobs.  *Workman* v. Comm'r of Soc. Sec., 105 F. App'x 794, 799 (6th

Cir. 2004) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th

Cir. 1987)).  Substantial evidence may be produced through reliance on the testimony

of a VE in response to a hypothetical question, but only if the question accurately

portrays the claimant's individual physical and mental impairments.  *Workman*, 105 F.

App'x at 799 (quoting *Varley*, 820 F.2d at 779).

Plaintiff contends that the Commissioner failed to meet his step five burden

because the hypothetical question to the VE upon which the ALJ relied to make his

decision did not adequately portray Plaintiff's limitations, as it did not include the

following limitations:  the need to nap one hour every day, being late to work three or four times a month, and/or being limited to only sedentary work.  But the ALJ is required to include in her hypothetical only those limitations that she deems credible.  *Infantado v. Astrue*, 263 F. App'x 469, 477 (6th Cir. 2008) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  Credibility determinations regarding a claimant's subjective statements rest with the ALJ, *see Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (per curiam), and the ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly, *see Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Based on the objective record evidence, Plaintiff's testimony, and Plaintiff's daily activities, the ALJ found that," to the extent . . . the claimant alleges she cannot work within the residual functional capacity, I find the allegation not fully credible."  (Tr. 24.)  Plaintiff has not taken issue with the ALJ's credibility determination; therefore, the Court finds no basis to question it and no basis to conclude that the ALJ should have included more limitations in her RFC determination.

Plaintiff further contends that the Commissioner failed to meet his step five burden because although the VE testified to a number of jobs that Plaintiff could perform in the "national" economy, the VE failed to provide a significant number of such jobs in the local or regional economies.  Plaintiff's contention that the VE should have provided numbers of jobs in the local economy lacks merit because "[t]he Commissioner is not required to show that job opportunities exist within the local area."  *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999).  Moreover, for the following

21

reasons, the Court is not persuaded that the VE failed to state a significant number of jobs in the regional economy.

The VE testified that Plaintiff could perform a total of 106,000 jobs in the national economy.  (*See* Tr. 48-49.)  Work that exists in the national economy is defined as work that exists either in the region where an individual lives or in several regions of the country.  *Id.* (quoting 42 U.S.C. § 423(d)(2)(A)); *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988).  Plaintiff suggests that this definition requires a VE literally to state numbers of jobs in the "regional" economy as opposed to the "national" economy.  This is a *non sequitur*.  Plaintiff does not cite, and the Court is not aware of any legal authority that requires a VE to use magic words in his testimony to designate numbers of jobs in the "regional" economy; therefore, the Court is not persuaded that the VE should have done so here.  Moreover, there is no reason to assume the VE intended a definition other than that set forth in the regulations.

Plaintiff also suggests that, if the total number of jobs to which the VE testified were divided to estimate the number of jobs that might exist in the particular region where Plaintiff lives, the resulting number would not constitute a significant number.  But there is no bright line rule for determining what constitutes a significant number of jobs; such a determination is based on the context of each case.  *See Hall*, 837 F.2d at 275.  An ALJ "should consider many criteria in determining whether work exists in significant numbers, some of which might include:  the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of traveling to engage in the assigned work; the

isolated nature of the jobs; [and] the types and availability of such work." *Id.*  The

decision should ultimately be left to the ALJ's common sense based on a particular

claimant's factual situation.  *See id.*  However, "the ALJ need not explicitly consider

each factor."  *Harmon*, 168 F.3d at 292.

The Court finds no basis to conclude that the ALJ failed to consider whether the

jobs to which the VE testified were sufficient to constitute a significant number of jobs

either in the region where Plaintiff lives or in several regions of the country.  Plaintiff's

attorney stipulated to the VE's qualifications, and the VE testified that Plaintiff could

perform a total of 106,000 jobs in the national economy.  That number was based on a

reduction of numbers to accommodate the ten-pound lifting and carrying limitation in

the ALJ's hypothetical.  Plaintiff and her attorney did not challenge the adequacy of the

numbers of jobs at the hearing,[5] and Plaintiff fails to explain how the context of this

case based on the record evidence supports the conclusion that 106,000 jobs in the

national economy is not a significant number of jobs.  Accordingly, the Court finds no

basis to conclude that the Commissioner failed to show there was a significant number

of jobs in the national economy that Plaintiff could perform.  *Cf. Geiger v. Apfel*, 229

---

[5] Plaintiff contends for the first time in her Brief on the Merits that the jobs to
which the VE testified have not been updated in the Dictionary of Occupational
Titles in over 25 years, and that her counsel failed to raise this issue or cross-
examine the VE during Plaintiff's hearing.  (Pl.'s Br. 14.)  Plaintiff does not
explain these issues further or provide any legal authority related to them, and
the Court will not speculate what Plaintiff's argument might be.  *See
McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues adverted
to in a perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed waived.  It is not sufficient for a party to mention a
possible argument in the most skeletal way, leaving the court to put flesh on its
bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir.
2006) (citing *McPherson* to reject an inadequately developed argument).

F.3d 1151 (Table), No. 98-5412, 2000 WL 1257184, at *2 (6th Cir. July 10, 2000) (finding that 75,000 jobs nationally constituted a significant number of jobs); *Kappesser v. Comm'r of Soc. Sec.*, 69 F.3d 537 (Table), No. 95-5387, 1995 WL 631430, at *4 (6th Cir. Oct. 26, 1995) (finding that 422 jobs locally, 1,149 jobs statewide, and 101,212 jobs nationally constituted a significant number of jobs); *Bishop v. Shalala*, 64 F.3d 662 (Table), No. 94-5375, 1995 WL 490126, at *2-3 (6th Cir. Aug. 15, 1995) (finding that 6,100 jobs nationally constituted a significant number of jobs, and explaining that "[t]he fact that the VE did not state the exact location of the jobs is insignificant in this case" because "[w]hile the expert was still on the stand, both [the claimant] and her attorney affirmatively stated that they had '[nothing] else . . . to say about these kinds of jobs.'"); *Trimiar v. Sullivan*, 966 F.2d 1326, 1331-32 (10th Cir. 1992) (finding that 900 to 1,100 jobs statewide constituted a significant number of jobs); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (finding that 174 jobs locally, 1,600 statewide, and 80,000 nationally constituted a significant number of jobs).

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  November 14, 2011